**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:11-cr-098-TMB-JDR |
| Plaintiff, | |
| vs. | <u>**RECOMMENDATION**</u><br><u>**REGARDING**</u><br><u>**MOTION TO SUPPRESS**</u> |
| ERNEST HANSON, | |
| Defendant. | (Docket No. 14) |

Defendant **ERNEST HANSON** moves for suppression of evidence of his statements admitting possession and the presence of a weapon in his residence. He also moves to suppress the seizure of two firearms from his residence on December 4, 2010. Hanson is charged in an Indictment with being a felon in possession. He contends that any of his admissions were involuntarily made including his consent to enter and search the residence. He also contends that his statements were taken in violation of his rights under <u>Miranda v. Arizona</u>, 384 U.S.

436 (1966).  The United States filed an opposition to the defendant's motion to suppress, Docket 16.  An evidentiary hearing was conducted before the magistrate judge on January 11, 2012 and factual findings are set forth below.

Hanson argues that Trooper Dustin Jorgensen and Deputy U.S. Marshal Rochelle Liedike entered his house without permission, and without a search warrant or an arrest warrant.  He asserts that his arrest was unlawful and the officers' questions to him about the presence of firearms in the house were asked in the absence of the <u>Miranda</u> warnings and his admissions were in any event involuntarily made.  He claims that his consent to search was a mere acquiescence to authority and not voluntarily given.

For reasons stated below *the magistrate judge recommends that the Motion to Suppress be granted in part and denied in part.  The motion should be granted as to the defendant's statements and denied in all other respects*.

### Findings of Fact

On March 5, 2004, Ernest Hanson was convicted of Attempted Sexual Assault in the third degree in violation of AS 11.41.425(a)(i)(C) and AS 11.31.100.  He was required to register with the State of Alaska Sex Offender Registry by virtue of that conviction which is defined as a "sexual offense."  A.S. 12.63.100(6)(C)(i).

On December 4, 2010 Deputy U.S. Marshal Liedike and Alaska State Trooper Jorgensen were conducting a Village Crime Reduction and Community

Orientation Policing Program in Alakanuk, Alaska.  Under Alaska State law sex offenders are court-ordered to register and remain in compliance with the law.  One of the individuals on the non-compliance list was Ernest Hanson.

This was a joint mission of the Marshal Service and Alaska State Troopers as a compliance check for the Sex Offender Registry under Alaska State law.  According to Deputy Liedike the officers' contact with Hanson did not involve any investigation of federal criminal law.

Trooper Jorgensen is an investigator with the Technical Crimes Unit in the Alaska Bureau of Investigation.  His basic job duties include investigating child exploitation cases, on-line enticement of a minor, and child pornography possession and distribution.  On December 4, 2010 Trooper Jorgensen had a printout from the Alaska Police Security Information Network (APSIN), an Alaska database containing information about anyone who has come into contact with Alaska law enforcement.  The APSIN printout indicated that Hanson was out of compliance with his sex offender registration.  Trooper Jorgensen wore a standard State Trooper uniform and a coat displaying the Department of Public Safety badge as well as his law enforcement identification badge.

The U.S. Marshal's office in Anchorage has a person designated to review the sex offender registry list for non-compliance.  Before proceeding on this trip, Deputy Liedike obtained a printout from that employee that indicated Hanson

was not in compliance. Part of the mission was to determine whether the sex offender was living where he stated he was residing, whether there were any children living there, and whether the offender was meeting all of the requirements imposed upon him as a sexual offender. Deputy Liedike also depended upon the Village Safety Protection Officers (VSPO) to assist in identifying the residence of the suspected non-compliant offender in each community.

Deputy Liedike wore a U.S. Marshal's uniform with an outer jacket showing "U.S. Marshals," and a logo with a badge which was depicted across the back. She had information before arriving in the village of Alakanuk that Ernest Hanson lived in a house on Main Street. Alakanuk is located in the Yukon-Kuskokwim region. Prior to arriving in the village, Deputy Liedike reviewed a print out of Hanson's criminal history. The print out indicated a long history of alcohol related offenses. Deputy Liedike and Trooper Jorgensen, together with several VSPOs arrived at Hanson's residence on December 4, 2010.

Deputy Liedike and Trooper Jorgensen knocked on the door and Ernest Hanson opened it. The officers were identified by their clothing. They asked if they could talk with him. He said yes and by his conduct consented for the officers to come inside. The two officers entered the residence to talk with Hanson and learned that a family member had just fallen down the stairs in front of the house and was hurt. The occupants were waiting for the health aide from the Village to come pick

her up. The officers said they would talk to Hanson after the situation had been resolved. The officers spoke casually to the injured relative and Hanson while waiting for the health aide(s) to arrive.

Several VSPOs entered the residence to assist in carrying the family member out of the house on a stretcher after a transport vehicle arrived. Afterwards, Deputy Liedike and Trooper Jorgensen came back into the residence to talk with Hanson. There was no one else in the house. The VSPOs left with the medical team. The officers did not ask Hanson for permission to remain or re-enter the house after the others left.

Inside the residence the officers informed Hanson that they were there to talk to him about the sexual offender registry. Hanson indicated that he understood. Trooper Jorgensen told Hanson that they were going around the Village talking to different people who were registered sex offenders and they wanted to determine the reason he was out of compliance.

The officers asked Hanson if he had any paperwork in regard to the registry. Hanson advised that he had been sending in his paperwork. Hanson produced some paperwork but the papers produced by Hanson showed that he was out of compliance by approximately two to three months. Hanson was unable to provide any paperwork saying he had registered recently. The Trooper told Hanson

that because he was out of compliance he was committing a criminal offense and they would be taking him to jail. Hanson responded, "Okay. I understand."

Trooper Jorgensen did a pat-down search of Hanson after informing Hanson that he would be taken into custody. Hanson was told by the trooper that he would have to check him for sharp objects, grenades and other items. The Trooper performed a pat-down search over Hanson's coveralls and checked the pockets of the coveralls. The only time Hanson was asked to place his hands behind his back was when Trooper Jorgensen did the pat-down search of him. The defendant complied. Hanson was wearing bulky clothes and a one-piece Carhartt jumpsuit. The thick Carhartt jacket and coveralls made it difficult for the officer to determine what was underneath because of the thick padding of the clothing.

The residence consisted of a single room with part of the room sectioned off into a small bathroom across from the doorway. A kitchenette was to the right of the door and a bed was located to the left. The room was about 30 feet by 30 feet. The house also contained a boiler and water heater in the center of the home. It was a cold day outside, around minus 20 degrees Fahrenheit. The officers allowed Hanson to close up the house before leaving. Hanson was looking for his medication, a cell phone, boots and gloves. The officers asked him to turn off the radio, and Hanson also needed to turn the stove and lights off.

At one point Hanson reached for a bag and Deputy Liedike stopped him by putting her hand on the bag and on his hand. She stated: "You cannot be reaching for things. I don't know what is in the bag or what you have in the house. Do you have any weapons in the house?" Hanson responded, "No." The officers had not yet searched the house or the area around Hanson.

The Trooper noticed that Hanson was looking around in another part of the house. Hanson asked if he could retrieve the keys to a snow mobile so that it would not be stolen. He also needed to retrieve keys to the house to lock it up. Trooper Jorgensen told Hanson that they wanted to allow him to lock things up but they needed to know if he had any weapons in the house before they allowed him to walk around freely and turn things off. When Hanson went into the bathroom area to gather items, the Trooper noticed that there was a gun safe. He asked Hanson again if he had any firearms in the residence and he replied that he did. The Trooper asked where the firearms were located and he said they were under the bed in the bedroom. The Trooper then asked Hanson for permission to search in the area. Hanson gave his permission. Hanson was never told that he had a right to deny the officers entry into in his house or that he had a right to refuse a search of his house.

Trooper Jorgensen looked under the bed and located a shot gun and a rifle. At no time did the officers advise Hanson of his <u>Miranda</u> rights. The officers

indicated on record at the evidentiary hearing that his was because they did not intend to interrogate him. Trooper Jorgensen wore a microphone that recorded the verbal statements of the parties in the residence.

One of the officers remained close to Hanson at all times because they were unaware of what items were in the house. The officers allowed Hanson to move around and show them where different items were located. Hanson gave information as to where objects were located such as his medication or cell phone, and the objects were retrieved by the Deputy Marshal. The Deputy Marshal turned off Hanson's radio and retrieved Hanson's keys.

Handcuffs were placed on Hanson just before the officers were ready to walk him out the door. Neither officer drew a weapon at any time. (It was cold outside and the officers wanted to make sure Hanson was dressed warmly for the weather.) It was possible that Hanson would be transported on a snow mobile to a jail facility in Emmonak.

Trooper Jorgensen testified at the suppression hearing that he did not give Hanson a <u>Miranda</u> advisement because he did not expect to obtain any information from him that would have been used in a criminal proceeding. The Trooper knew prior to the contact that Hanson was a convicted felon as he had an APSIN printout of Hanson's criminal record.

Prior to the contact on December 4, 2010 neither the Trooper nor the Deputy Marshal personally contacted any employee of the Department of Public Safety Sexual Registry office or requested paperwork from Hanson's sexual offender registry file. Prior to going to Alakanuk the both officers had a list of all registered sex offenders in Alakanuk, both compliant and non-compliant. The list was obtained from the Sex Offender Registry website.

Hanson was arrested for failure to register as a sex offender. The Trooper admitted on cross-examination at the evidentiary hearing that one of Hanson's prior convictions which preceded August 10, 1994 would not require registration as a sex offender. However, Hanson was convicted in 2004 of attempted sexual assault in the third degree, a violation of A.S. 11.45.425 requiring him to register with the State of Alaska Sex Offender Registry. Failure to register as a sex offender is a violation of state law punishable under Alaska Statute 11.56.840(a). The offense is a class A misdemeanor when there has been no previous conviction under Alaska Statute 11.56.840. *See* A.S. 11.56.840(b).

## Discussion

## I. Lawfulness of Defendant's Arrest

Hanson argues that the officers lacked authority to arrest him for a misdemeanor because the officers lacked personal knowledge that a misdemeanor was occurring in their presence. He contends that the officers cannot rely on past

communications from the Department of Public Safety that he had failed to comply with the registration requirements.

Alaska, like most states, holds to the view that a warrantless misdemeanor arrest may be made only for an offense committed "in the presence" of the officer.[1]  In <u>Miller v. State</u>, 462 P.2d 421 (Alaska 1969) the court stated:

> The relevant arrest statute, AS 12.25.030(1), authorizes a private citizen or a police officer, without a warrant, to make an arrest for a crime 'committed or attempted in his presence.' An arrest for a misdemeanor made by an officer without a warrant is valid if the offense is committed in his presence. <u>Rubey v. City of Fairbanks</u>, 456 P.2d 470, 474 (Alaska 1969); . . .an arrest under AS 12.25.030(1) is lawful where the peace officer has perceived facts which would lead a reasonable man to believe that the arrestee has committed or attempted to commit an offense in his presence.

In <u>Howes v. State</u>, 503 P.2d 1055 (Alaska 1972), the Alaska Supreme Court stated, in discussing A.S. 12.25.030(1): "Two elements are involved in the term 'presence': (1) The officer must observe acts which are indicative of the commission of an offense; (2) The officer must be aware that he is in fact seeing an offense being committed."

There is a well-established rule as to probable cause that the information to be considered is the "collective knowledge of officers working together."  *See* Wayne LaFave, Search and Seizure Treatise on the Fourth

---

[1] The presence test is not mandated by the Fourth Amendment to the Constitution.

Amendment, § 3.5(c), Vol. 2; Mattern v. State, 500 P.2d 228, 232 (Alaska 1972) (citing Draper v. United States, 358 U.S. 307, 313 (1959)). ("Information relayed to a police officer via the police radio may provide probable cause to arrest."). The Mattern court added: "However, when one officer furnishes evidence to another officer which leads to an arrest, the state must prove the reasonable basis of the former officer's information." Here, the Deputy Marshal and Trooper relied on information retrieved by law enforcement from the Registry records. See e.g., United States v. Miller, 589 F.2d 1117 (1st Cir. 1978) (misdemeanor arrest for driving 30 miles per hour over the speed limit even though the arresting officer never clocked the defendant).

The nature of the offense for which Hanson was arrested leads to a reasonable conclusion that the Alaska State Legislature intended the offense to be of a continuing nature until resolved with compliance. The officers were lawfully present at a place where they could lawfully confront Hanson with the fact that their records showed his non-compliance with the Sex Offender Registry Act. Although Hanson did not admit to being in non-compliance, when confronted with that issue he was unable to provide evidence to show otherwise. The facts confronting Trooper Jorgensen gave him probable cause to believe that the offense was being committed. The test for probable cause to sustain an arrest was stated in Brinegar v. United States, 338 U.S. 160, 175-176:

Probable cause exists where the facts and circumstances within . . . [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.

Probable cause to arrest does not require an "actual showing that [criminal] activity occurred" but "requires only a fair probability or substantial chance of criminal activity." VanSandt v. Brown, 944 P.2d 449, 452 (Alaska 1997). "Probable cause to arrest exists if the facts and circumstances known to the officer would support a reasonable belief that an offense has been or is being committed by the suspect." State v. Joubert, 20 P.3d 1115, 1118-19 (Alaska 2001). Trooper Jorgensen had a substantial reason to believe, from his knowledge and observation, that Hanson was in non-compliance with the Registry Act.

The officers did provide Hanson an opportunity to show that he was in compliance. Hanson never stated that he was in compliance. He said that he had filled out the paperwork. Hanson produced nothing substantial to indicate that he was in compliance or to suggest that the records might be incorrect about his compliance status. Hanson provided no papers or specific statements that would have required the officers to contact the Department of Public Safety to verify his non-compliance status. The failure to comply with quarterly reports was a continuing offense and one which the law considers occurring in the officer's presence when he confronted the convicted sex offender. The officers were not required to conduct

any verification process beyond the information they received from a police employee's check of the Registry.  An officer may rely upon another officer to obtain information from a sex offender registry without the arresting officer having to do that himself.

## II.  Entry into Residence

Based upon the totality of the circumstances, Hanson freely and of his own will invited the Deputy Marshal and Trooper to talk with him inside his house. The officers did not need to obtain permission a second time after the defendant's injured cousin and the VSPOs left the residence leaving the Deputy Marshal and State Trooper to converse with Hansen.

## III.  Application of <u>Miranda</u>

<u>Miranda v. Arizona</u>, <u>supra</u>, holds that the government cannot use statements elicited during a custodial interrogation unless it demonstrates compliance with certain procedural safeguards mandated as a means of securing the privilege against self-incrimination.  The <u>Miranda</u> safeguards are intended to counteract the combined effects of interrogation and custody.

It is undisputed that the <u>Miranda</u> rights were not given to Hanson. Hanson was not first informed in clear and unequivocal terms that he had the right to remain silent to safe guard his privilege against self-incrimination.  Any statement obtained in violation of <u>Miranda</u> and its progeny may  not be admitted into evidence

regardless of whether it is a confession or an admission of part of an offense or whether the statement is inculpatory or allegedly exculpatory.  *See* <u>United States v. Orso</u>, 266 F.3d 1030 (9th Cir. 2001).

## A.  Whether Hanson was in Custody

The Supreme Court explained that custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, <u>supra</u>.  In <u>New York v. Quarles</u>, 467 U.S. 649 (1984), the Supreme Court stated: "The ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  <u>Id</u>. (quoting <u>California v. Beheler</u>, 463 U.S. 1121 (1983)).

In the instant case the government agrees that <u>Miranda</u> applies after Hanson was told he was going to be arrested.  Although Hanson had not been taken into formal custody he was deprived of his freedom of action in a significant way. Clearly, Hanson's statements about the guns were obtained under circumstances in which the "potentiality for compulsion is forcefully apparent."  <u>Miranda</u>, <u>supra</u>. Clearly a reasonable person in Hanson's position would believe that he was in police custody to a degree associated with formal arrest.  <u>United States v. Hudgens</u>, 798 F.2d 1234, 1236-37 (9th Cir. 1986).

//

## B. Whether Hanson was Interrogated

"Interrogation" means the "questioning initiated by law enforcement officers after a person has been taken into custody . . . ." <u>Miranda</u> at 444; <u>Shedelbower v. Estelle</u>, 885 F.2d 570 (9th Cir. 1989), <u>cert</u>. <u>denied</u> 111 S. Ct. 975. A "response from the suspect" means any statement or non-verbal act which might be used against the suspect in a court. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980). Not all questioning by a law enforcement officer constitutes interrogation. For example, Courts have recognized that the routine gathering of background or "booking" information ordinarily does not constitute interrogation. <u>United States v. Booth</u>, 669 F.2d 1231, 1238 (9th Cir. 1981); <u>United States v. Perez</u>, 776 F.2d 797 (9th Cir. 1985). The question here is whether, under the circumstances, asking Hanson if he has a firearm nearby constitutes interrogation.

The ultimate test for whether questioning constitutes interrogation is "whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response." <u>Booth</u>, 669 F.2d at 1238. The officers intent in asking the question is relevant, but not determinative. <u>Id</u>. *See* also <u>United States v. Mata-Abundiz</u>, 717 F.2d 1277, 1280 (9th Cir. 1983). Trooper Jorgensen questioned Hanson about whether he had any firearms in the residence.

In the instant case, Hanson was closely watched by the two officers who retrieved items for him to help him prepare to leave his residence un-occupied. It was appropriate for officer safety for Deputy Liedike to physically prevent Hanson from opening a bag and inquire about its contents. She asked him if he had a firearm and he replied no.

Trooper Jorgensen's question about having weapons was predicated more on his observation of the gun safe in the residence. The evidence does not indicate whether the gun safe was locked. The officers could have handcuffed Hanson immediately if it was necessary for officer safety. Hanson was not handcuffed until he was escorted from the residence.

Under the facts of this case, Trooper Jorgensen should have known that the question regarding the presence of a firearm in the residence was likely to elicit an incriminating response. The Trooper knew that Hanson was a convicted felon and as such was not permitted to possess a firearm. There were no other persons present in the residence at the time who could have retrieved a firearm and threaten the officers' safety. Because Trooper Jorgensen's question about a firearm properly relates to officer safety, the officer was allowed to ask the question without first mirandizing Hanson. However, because the question is also reasonably expected to elicit an incriminating response (questioning a known convicted felon about

possession a firearm), the government should not be allowed to use Hanson's response in their case-in-chief due to the absence of the <u>Miranda</u> warnings.

## IV.  Lawfulness of Consent to Search

Although the officers allowed Hanson some freedom of movement within his residence, this does not mean the officers could search anywhere in the house for a weapon under the theory of a "search incident to an arrest" as argued by the government.  The government, however, also relies upon the consent Hanson gave to search the residence for a firearm.

### A.  Voluntariness of consent to Search

Generally, a warrant is required for a search of a residence to be reasonable under the Fourth Amendment.   A valid consent to search is an exception to the Fourth Amendment requirement.  To be valid however, a consent to search must be voluntary.  The voluntariness of a consent to search is determined under the totality of the circumstances and the government bears the burden of proof.  <u>United States v. Zapata</u>, 997 F.2d 751, 758 (10th Cir. 1993).  "Voluntariness" as applied to a consent to search, can not be taken to mean simply a "knowing" choice made by a person with a capacity for conscience choice.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 224 (1973).   The government must show that "there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that

it was freely and intelligently given." Id.; United States v. Reid, 226 F2d 1020, 1026 (9th Cir. 2000).

The voluntariness of a person's consent to search presents a question of fact. The custodial status of the consenting party is not determinative of the voluntariness of the consent to search. United States v. Fleck, 413 F.3d 883, 892 (8th Cir. 2005). To be voluntary, a consent must be the product of a essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied. Id. After Hanson's reply to the Trooper's question indicated that he did have firearms in the residence the Trooper followed up by asking him where those firearms were located. Hanson indicated that they were under the bed in the bedroom. The Trooper then asked permission to search in that area and Hanson gave him permission.

"The Due Process Clause does not mandate that the police forego all questioning . . . ." Id. at 226. The question is whether the consent is the product of an essentially free and unconstrained choice by its maker. Knowledge of the right to refuse to consent to search is but one factor to be taken into account and the government need not establish such knowledge to show a voluntary consent. Id. at 227.

In considering the totality of the surrounding circumstances including the characteristics of the suspect and the details of the interrogation the court considers

the person's age, lack of education, intelligence, lack of any advice to the accused of his constitutional rights, the length of detention, the use of physical punishment such as a deprivation of food or sleep, to assess the psychological impact on the suspect and evaluate the legal significance of how the suspect reacted. Schneckloth v. Bustamonte, 412 U.S. at 226. The standard of intentional relinquishment or abandonment of a known right or privilege (under the doctrine of Johnson v. Zerbst, 304 U.S. 458 (1938)) does not apply in determining the "voluntariness" of a consent search. Id. at 243-44. The Supreme Court stated "there is nothing constitutionally suspect in a person's voluntarily allowing a search." Id. at 243.

At the time of his consent Hanson was not physically restrained although he was under arrest, and Trooper Jorgensen's inquiry soliciting a consent to search was neither deceptive nor argumentative. Hanson had not been subjected to physical punishment or deprived of food or sleep by the officer. He was indoors away from the effects of the cold weather outside and there was no showing that his will was over borne because of the lack of education or low intelligence.

The standard for measuring the scope of a consent to search under the Fourth Amendment is that of objective reasonableness, namely, what the typical reasonable person would understand the search to include by the verbal exchange between the officer and the individual. The colloquy between the officer and Hanson focused on a consent to search for the firearms in the residence, not to search for

other items or to conduct an exploratory search of the residence generally. Hanson

was not mistreated nor did the officers threaten him with violence or promise him any

inducements to elicit his consent to search for the firearms. Trooper Jorgensen was

forthright in his request and the consent was not obtained by deception or trickery.

There is no evidence that Hanson was under the influence of any intoxicants or that

his mental capacity was hampered by the lack of any medication.

The officer did not coerce him or tell him that he could obtain a search

warrant if no consent was granted. Hanson had past experience with law

enforcement and had observed the officers allow the medical team to remove his

injured cousin from the premise before conducting their inquiry. The consent was

voluntarily given by him to the officer. The fact that he was going to be arrested

formally and transported to jail did not deprive his response to the inquiry for consent

from being consensual. Even a person in prison can give a voluntary consent to

search. United States v. Watson, 423 U.S. 411, 424-25 (1976); United States v.

Tolias, 548 F.2d 277, 278 (9th Cir. 1977).

### B.    Effect of **Miranda** Violation on Consent Search

Miranda, supra, protects a suspect against governmental coercion

leading him to surrender rights protected by the Fifth Amendment. Colorado v.

Connolly, 479 U.S. 157, 170 (1986). In United States v. McCurdy, 40 F.3d 1111

(10th Cir. 1994), the court held that an officer's request to search a defendant's

automobile did not constitute interrogation invoking a defendant's <u>Miranda</u> rights or violating his right to Due Process. *See* <u>Weeks v. Estelle</u>, 509 F.2d 760 (5th Cir. 1975) (search was valid when it was conducted after suspect had given his consent, even though no <u>Miranda</u> warnings were given suspect before consent was solicited.); and *see* <u>United States v. Patzer</u>, 277 F.3d 1080 (2002) (the omission of warnings designed to protect Fifth Amendment rights can be excused under the public safety exception to the exclusionary rule).[2]

<u>Wong Sun v. United States</u>, 371 U.S. 471, 484-86 (1963) requires the exclusion of tainted fruits of police conduct which abridges Fourth Amendment rights. The Ninth Circuit Court of Appeals in <u>United States v. Lemon</u>, 550 F.2d 467 (9th Cir. 1977) upheld the trial court's finding that the defendant had voluntarily consented and the consent was not the fruits of a <u>Miranda</u> violation which must be excluded. The court stated: "Statements taken in violation of <u>Miranda</u> may not be used to prove the prosecution's case at trial . . . Such evidence may, however, be used for other purposes, provided that its trustworthiness satisfies legal standards.

---

[2] <u>Patzer</u> holds that the omission of warnings designed to protect Fifth Amendment rights can be excused under the public safety exception to the exclusionary rule where the officer asks a question reasonably prompted by concern for public safety. The <u>Patzer</u> court ruled that the emergence of exigent circumstances does not automatically attenuate the taint between an earlier Fourth Amendment illegality (such an unlawful arrest) and the statements in evidence the arresting officer obtains in the course of reacting to the exigency. In the instant case there was no Fourth Amendment violation and Hanson was not subjected to an illegal arrest. He was lawfully in police custody.

Statements elicited prior to the giving of <u>Miranda</u> warnings may be used during a motion to suppress to show defendant's consent to search." 550 F.2d at 473 (citations omitted).

## Summary

Ernest Hanson was lawfully arrested by Trooper Jorgensen on December 4, 2010 in Alakanuk.  When questioned by the Trooper about the presence of firearms in the house, *his statement(s) in response should be suppressed* because it constituted custodial interrogation in the absence of <u>Miranda</u> warnings.  Hanson gave a voluntary consent to search his residence for firearms and *the Motion to Suppress the firearms should be denied.*  IT IS SO RECOMMENDED.

DATED this 25th day of January, 2012, at Anchorage, Alaska.


*/s/ John D. Roberts*
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **CLOSE OF BUSINESS, 2/6/2012.**

Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.

The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.

Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.

Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, 2/10/2012.** The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).